**J. M. PULLIAM, Respondent,**

v.

**W. H. BOND, Henry C. Chatterson, and R. A. Johnson, Appellants.**

**No. 51124.**

Supreme Court of Missouri,
Division No. 2.

Sept. 12, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 10, 1966.

Thaine Q. Blumer, Blumer & Wright, Kansas City, for respondent.

Gray & Sommers, Charles E. Gray, St. Louis, Jack C. Terry, Kansas City, for appellants.

STORCKMAN, Judge.

This is an action for libel wherein the jury returned a verdict for plaintiff for $30,000 actual damages and for punitive damages aggregating $20,000 against three defendants. Motions for new trial were overruled on the condition that $15,000 be remitted from the actual damages. The plaintiff remitted accordingly and a judgment was entered for $15,000 actual damages and $20,000 punitive damages. The defendants appealed from the judgment so rendered.

The plaintiff and the defendants were all members of the Executive Committee of the Joint Protective Board Brotherhood Railway Carmen of America on the Missouri Pacific System and Allied Lines. The claim of libel is based on a written statement charging the plaintiff with misconduct in his official capacity. The statement of charges was prepared, signed and filed by a majority of the Executive Committee as provided by the rules and bylaws of the Brotherhood. The Brotherhood of Railway Carmen consists of a Grand Lodge and various subordinate or local lodges. The Joint Protective Board, sometimes referred to as the Board, consists of the duly elected Local Protective Board chairmen from each of the participating lodges. The officers of this Joint Board are the chairman, first vice-chairman, second vice-chairman, and

the secretary-treasurer, who with three other elected members constitute the Executive Committee of seven members. The defendant Bond was chairman, the plaintiff was first vice-chairman, and the defendant Chatterson was secretary-treasurer of the Joint Protective Board and, as such, they were members of the Executive Committee. Other defendants were elected members of the Executive Committee. The offices on the Joint Board held by Mr. Bond and Mr. Pulliam are sometimes referred to in the transcript and exhibits as the General Chairman and the Vice-General Chairman, respectively, but for brevity at least we will generally refer to them as chairman and vice-chairman.

Among other duties the chairman of the Joint Board had general direction of local chairmen in their work; he was required to attend all legitimate calls from local lodges for advice, consulation or adjustment of grievances and disputes. The chairman had authority to deputize any other member of the Executive Committee to assist him in performing his duties when necessary. Among the duties specified by the bylaws and rules of the Joint Protective Board, the first vice-chairman was required to perform such duties as were assigned to him by the chairman of the Board. Generally the officers on behalf of the Board were required to discharge such duties as may be imposed upon them by law including the making of reports to federal or state authorities and the maintaining and keeping of records as required by law.

The vice-chairman or any member of the Executive Committee of the Joint Protective Board when working under the direction of the chairman was entitled to receive a monthly salary and an allowance for expenses "while away from home point". When any member was engaged less than a month, he was entitled to receive salary "based on the days worked". The monthly salary was $650 and the daily salary was $21.67; the expense allowance was $20 per day. Expense accounts were required to be itemized and approved by the chairman be-

fore payment. The Executive Committee was required to examine and approve or reject expenditures referred to them by the chairman. It was further provided that money and property of the Board should be used only for the benefit of the Board and such purposes permitted or required by the constitution of the Brotherhood of Railway Carmen and not for the personal gain or profit of any officer or member. The officers were to be held to this standard of conduct and accountable for any breach thereof.

The plaintiff, a resident of North Little Rock, Arkansas, had been a member of the Brotherhood of Railway Carmen for about 20 years. He was elected vice-chairman of the Joint Protective Board at the biennial convention in May 1959 and thereby became a member of the Executive Committee. As vice-chairman the plaintiff represented members of the Brotherhood in disputes and grievances with the Company. He got his assignments from chairman Bond who was a full-time employee of the Board with offices in St. Louis. The plaintiff was regularly employed by the railroad as a car inspector. For his part-time work for the Joint Protective Board, he was paid the daily rate of $21.67 and when he was away from his "home point" he was also entitled to the expense allowance of $20 per day. The plaintiff, like other officers of the Joint Protective Board, had a pass on the Missouri Pacific Railroad which he was supposed to use for transportation when he was on business for the Board. Travel by private automobile was not ordinarily authorized because free transportation was available on the railroad and the Brotherhood might be exposed to liability in case of an automobile accident while the representative was so traveling.

The transcript of the record consists of 681 pages so the minutiae will be omitted and further essential evidence will be related and discussed in connection with disposition of the questions presented. For the present, it is sufficient to say that the evidence tends to show that chairman Bond

began to encounter difficulties with the plaintiff's expense accounts early in 1960. The plaintiff's expense accounts were sent in duplicate to chairman Bond whose duty it was to approve them before they were sent to Mr. Chatterson in Kansas City for payment.

At an Executive Committee meeting held the latter part of October 1960, the plaintiff's expense accounts and activities were the subject of extensive discussion. This was the first meeting attended by the defendant R. A. Johnson who was appointed to fill a vacancy on the Committee. On October 28 the Executive Committee went over practically all of the plaintiff's expense accounts for 1960 beginning with the month of February 1960. This part of the meeting at least was taken in question and answer form and was made a part of the minutes of the meeting of the Executive Committee. The evidence shows that charges had been filed against chairman Bond for "mal-function of the duties" of his office and that he had been tried and cleared of these charges on October 3 and 4, 1960. At the October meeting Mr. Bond announced to the other members of the Executive Committee that he had had to become exceedingly careful to what he signed his name and he was going to be very careful in the future; that, "Some people have taken advantage of us and it is going to stop." Before approving the plaintiff's expense accounts for April and May 1960, chairman Bond had discovered errors and charges which he rejected and, at the chairman's request, the statements were corrected by the plaintiff and resubmitted. At this Executive Committee meeting it was asserted that the plaintiff had made several unauthorized trips, two of which were admitted by the plaintiff. It was further asserted that the plaintiff had used his automobile on trips without authorization; that in one instance he had traveled by airplane without approval or disclosure, and that the plaintiff had "walked out of" an investigation in Omaha which resulted in criticism and embarrassment to the chairman and necessitated setting up an-

other investigation at a cost to the Joint Board of about $800. At one point in the Executive Committee meeting, the plaintiff asked if any charges had been preferred against him and when he was given a negative answer, he stated, "Then I won't answer any more questions—I want no questions asked me." At the conclusion of the discussion, the plaintiff was admonished by the chairman just to carry out his assignments in the future and not to use his automobile unless authorized.

After the Executive Committee meeting was concluded, the members of the Committee, other than the plaintiff, asked chairman Bond to investigate further and report to them. On January 28, 1961, the members of the Executive Committee, other than Mr. Bond and Mr. Pulliam, signed a statement charging the plaintiff with violation of the Grand Lodge Constitution in that he made unauthorized trips to points on the railroad in the capacity of vice-general chairman, that he charged the Board with pay for trips away from his home point when he was under pay from the carrier at his home point, and that he was guilty of breach of conduct by abstracting funds for personal gain as set out in the minutes of the Executive Committee meeting held October 26, 1960. This statement bore the notation that it should be submitted to the Board's attorneys for approval.

The statement of charges as revised by the attorneys is the basis of the libel action. It is dated February 17, 1961, and signed by Executive Board members George Franklin, R. A. Johnson, W. H. Smith, H. C. Chatterson and W. W. Waters. It is addressed to H. C. Chatterson, Secretary-Treasurer, Missouri Pacific Joint Proctective Board, and reads as follows:

"The majority of the Executive Committee of the Missouri Pacific Joint Protective Board hereby charge Mr. James M. Pulliam, Vice-General Chairman, Missouri Pacific Joint Protective Board and Local Chairman, Harmony Lodge No. 114, Little Rock, Arkansas, with malfeasance of office in that he

made numerous unauthorized trips to points on the railroad in the capacity of Vice-General Chairman without authorization to do so. Mr. Pulliam is also charged with using his automobile to make unauthorized trips to various points on the railroad in the capacity of Vice-General Chairman and that he charged to Joint Protective Board for pay for trips away from home when he was under pay from the carrier at his home point.

"Mr. Pulliam is further charged with malfeasance in office for illegally abstracting funds of the Missouri Pacific Joint Protective Board for personal gains by submitting to the Board for approval statements requesting payment for expenses, pay and per diem for dates to which he knew he was not entitled, said dates being as follows: September 8th, 1960, February 11th, 1960, February 13th, 1960, February 20th, 21st and 22nd, 1960, April 5th, 1960, April 11th, 1960, May 1st, 2nd and 25th, 1960, May 27th, 1960, August 4th and 9th, 1960.

"By virtue of the foregoing malfeasance in office Mr. Pulliam is specifically charged with violation of Section 21–A, Grand Lodge Constitution, Section 1–A, Grand Lodge Constitution, Section 72, Lines 83 through 87, Subordinate Lodge Constitution, Section 73, Lines 59 through 62, Subordinate Lodge Constitution, and Sections 501–A and 501–C Labor-Management Reporting & Disclosure Act of 1959.

"Under the provisions of Section 501–B, Labor-Management Reporting & Disclosure Act of 1959, claim is further made against Mr. Pulliam for all funds unlawfully received by him and demand is hereby made that he immediately refund to Missouri Pacific Joint Protective Board all refunds found to be illegally received.

"A majority of the Executive Committee deeming it necessary to protect the welfare and funds of the membership, does deem it advisable to remove from office Mr. James M. Pulliam pending the trial of these charges, and Mr. Pulliam is hereby removed from the office of Local Chairman, Harmony Lodge No. 114, Little Rock, Arkansas, and from the office of Vice-General Chairman, Missouri Pacific Joint Protective Board, effective immediately."

Section 501 of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C.A. § 501) in general provides that (a) officers and representatives of labor organizations occupy positions of trust and it is the duty of each such person to hold its money solely for the benefit of the organization and its members and to expend the same in accordance with its constitution and bylaws and to refrain from dealing with such organization as an adverse party; (b) when any officer or representative is alleged to have violated such duties and the labor organization or its governing board or officers refuse or fail to sue or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member, such member may sue to recover damages or secure an accounting; and (c) any person who embezzles, steals or unlawfully and willfully abstracts or converts to his own use any of the money or funds of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined or imprisoned, or both.

A copy of the charges was sent to the plaintiff at his home address as provided by the rules of the Brotherhood. There was evidence that the plaintiff presented a copy of the charges to his lodge, that he met with the officers of his lodge the day he received the charges and showed them he had been removed from office, that it was necessary to have the vice-chairman take over, but that he did not give copies of the charges to anyone else "at that time"; he "might have" given out some copies before the convention in May. The plaintiff gave copies to the man that represented him in the trial before the Trial Committee of the Brotherhood. He did not remember giving out copies to other persons in Little Rock.

On this appeal the defendants contend their motions for directed verdicts should have been given because: (1) the charges

against the plaintiff were brought and processed pursuant to the constitution and by-laws of the organization and, therefore, the statement of the charges was absolutely privileged; (2) in the circumstances of the case the plaintiff consented to the publication of the charges; (3) in any event, a qualified privilege was applicable and the charges were shown to be substantially true thereby rendering the plaintiff guilty of malfeasance in office; (4) there was no publication of the charges by the defendants beyond the limits permitted by a qualified privilege; (5) since a qualified privilege existed, there could be no presumption of malice, there was no evidence of express malice and to permit a recovery without a showing of malice would violate the defendants' rights under the First and Fourteenth Amendments of the Constitution of the United States. The defendants also assert that the court committed prejudicial error in the admission and refusal of evidence and in giving certain instructions.

The first question presented is whether the statement of the charges preferred against the plaintiff was absolutely privileged. A related contention is that the communication was qualifiedly privileged in any event. In support of their primary contention, the defendants cite Warren v. Pulitzer Pub. Co., 336 Mo. 184, 78 S.W.2d 404, White v. United Mills Co., 240 Mo. App. 443, 208 S.W.2d 803, and Porter v. Eyster, 4 Cir., 294 F.2d 613. The Warren case involves the publication by a newspaper of a feature article recounting the plaintiff's career as a minister and his church trial for improper conduct which resulted in his expulsion from the ministry. The Warren case is quite persuasive but, since it involves the republication by the newspaper and not the original proceedings, the case falls short of deciding this precise issue. White v. United Mills holds that a notice of separation demanded by the State Labor Commissioner of Kansas pursuant to Kansas law and submitted by an employer upon the form provided by the commis-

sioner and indicating the employer's reasons for discharging the employee was absolutely privileged. Porter v. Eyster held that the chairman of the Board of Stewards of a race track acting as provided by law under authority of the West Virginia Racing Commission in posting a notice upon a bulletin board that the plaintiff had been ruled off of the premises for acting improperly as a veterinarian was absolutely privileged and even if the chairman had only a qualified privilege there was no abuse of such privilege by excess publication although as a result of such posting the notice was published in newspapers of general circulation. The latter two cases appear to involve persons acting directly in quasi judicial capacities under legislative authority.

■■■ "The class of occasions where the publication of defamatory matter is absolutely privileged is confined within narrow limits to cases in which the public service or the administration of justice requires complete immunity from being called to account for language used." 53 C.J.S. Libel and Slander § 102, p. 164. The classic examples of the application of an absolute privilege are the proceedings of legislative bodies, judicial proceedings, and communications by military and naval officers. As indicated above, there is a tendency to extend the absolute privilege to occasions where the communication is provided for and required by law.

■■ The defendants urge that the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 501, brings this case under the extension of the rule of absolute privilege. We decline to so rule on this record. The federal statute does not clearly require the processing of charges in this manner and its influence on the proceedings seems to be secondary. The procedure used is more clearly in conformity with the rules and bylaws of the Brotherhood of Railway Carmen. On the record made, the rule of absolute privilege was not applicable to the statement of charges.

■ "It seems to be generally recognized that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc. Thus, it is well settled that members of such bodies may report on the qualifications of applicants, prefer charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation, so long as they act without malice." 33 Am.Jur., Libel and Slander § 132, p. 131. To the same effect are the statements in 53 C.J.S. Libel and Slander § 118, p. 194; Restatement of the Law of Torts, Vol. 3, § 596 d, p. 257; and Annotations: Libel and Slander—Labor Disputes, 19 A.L.R.2d 694, 698, § 5, and Defamation Connected with Labor Disputes, 150 A.L.R. 932, 949, c. 1. The Brotherhood of Railway Carmen has the attributes of a lodge and labor union, and the manner in which the charges were preferred were within the framework of the organization. The trial court correctly held that the communication in question was entitled to the protection of a qualified or conditional privilege. Williams v. Kansas City Transit, Inc., Mo., 339 S.W.2d 792, 796[2]; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S.W.2d 45, 60[14]; Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S.W. 100, 105[4], 26 L.R.A.,N.S., 1080.

■ By accepting membership in the Brotherhood, the plaintiff must be held to have consented to be subjected to having written charges filed against him and to have such charges processed in the manner provided by the constitution and bylaws of the organization and by applicable statutes. Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341, 345–346; Cleveland Orchestra Com. v. Cleveland Fed. of Musicians, 6 Cir., 303 F.2d 229, 230[1]; Ginsburg v. Black, 7 Cir., 237 F.2d 790, 794[4]; Commonwealth v. Shipherd, 157 Pa.Super. 27, 41 A.2d 429, 431[1]; Shurtleff v. Stevens, 51

Vt. 501, 31 Am.Rep. 698, 53 C.J.S. Libel and Slander § 95, p. 151, § 149, p. 232; Restatement of the Law of Torts, Vol. 3, § 583, p. 220; 29 U.S.C.A. § 411(a) (5).

■ In this posture of the case the plaintiff contends that the court properly refused to grant defendants' motion for a directed verdict "because the evidence was substantial that defendants maliciously and intentionally conspired to and did libel the plaintiff for the purpose of injuring his reputation and thereby defeating him in a union election, and that publication of the libel was made beyond and in abuse of any privilege." First we will deal with the assertion that the written statement was maliciously inspired. "The utterance or publication of a communication on a privileged occasion rebuts the inference of malice and falsity which would otherwise arise as a matter of law; and, where such a communication is shown, the burden of proving its falsity and that the defendant was actuated by express malice is generally held to be on the plaintiff." 53 C.J.S. Libel and Slander § 101, p. 161. The rule is recognized in Missouri as well as elsewhere that the existence of a conditional or qualified privilege precludes an inference of malice from the communication of false and defamatory matter and the plaintiff has the burden of proving express malice. See: Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341, 345[9], State ex rel. Zorn v. Cox, 318 Mo. 112, 298 S.W. 837, 839[2], Kleinschmidt v. Johnson, Mo., 183 S.W.2d 82, 84[3, 4], Cook v. Pulitzer Publishing Co., 241 Mo. 326, 145 S.W. 480, 490[16], Emde v. San Joaquin County Central Labor Council, 23 Cal.2d 146, 143 P.2d 20, 28[16], 150 A.L.R. 916, and New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686.

■ On the issue of actual malice all the evidence tends to prove that the dissatisfaction with plaintiff's official activities arose prior to the time the plaintiff decided to run for general chairman of the Joint Board and even longer before he disclosed his in-

tention and it became generally known that he was a candidate. Some of the charges made in the communication addressed to the defendant Chatterson were conceded by the plaintiff. At the October 1960 meeting of the Executive Committee, the plaintiff admitted that he made trips which chairman Bond had not authorized and one which had been expressly forbidden. He used his private automobile in traveling on official business without authorization on at least one occasion. The plaintiff's theory of libel as submitted to the jury in his verdict-directing instruction was limited to the second and third paragraphs of the statement of charges; however, all references to the constitutions of the Grand Lodge and the Subordinate Lodge appearing in the third paragraph were omitted from the instruction although § 501 of 29 U.S.C.A. is mentioned which in turn refers to the constitution and bylaws of unions. The charges of malfeasance made in the first paragraph of the statement were not submitted at all. The matters omitted must be deemed abandoned by the plaintiff as grounds of recovery. We mention this at this point, however, as bearing on the good faith of the defendants and the issue of express malice, rather than the questionable propriety of the instruction in this and other respects. In determining the issue of malice, we must consider the entire statement of charges and the evidence or lack of evidence in support of its allegations. Warren v. Pulitzer Publishing Co., 336 Mo. 184, 78 S.W.2d 404, 417 [22].

Much of the evidence in support of the charges of malfeasance by illegally abstracting funds is conceded. For example, the plaintiff at ten minutes before midnight on February 8, 1960, boarded a train in Little Rock which was due to depart at ten minutes after midnight. He charged the Board a day's salary and per diem expenses for February 8 although the time involved was ten minutes on the train before midnight and he was not supposed to collect the expense allowance while in Little Rock, his "home point". A similar instance occurred on at least one other occasion. The plaintiff claimed salary and expenses on days when the person with whom he was supposed to have an engagement denied he was with the plaintiff. The plaintiff on one occasion claimed salary and expenses when he was in Little Rock because he had expedited his return by use of airplane transportation. There are several incidents of this sort. The plaintiff sought to justify charging the Board in this manner by evidence that others had followed that practice, or the assertion that chairman Bond knew the true situation and made no objection. If the practice was wrongful the Brotherhood membership could not be estopped by similar acts or the acquiescence of others.

 Where all the facts stated are completely true, no defense of privilege is necessary since the truth is always a defense to libel. Warren v. Pulitzer Publishing Co., 336 Mo. 184, 78 S.W.2d 404, 412 [1]. "It is only in the event that defendant has published concerning plaintiff defamatory matter which is untrue that recourse need be had to the doctrine applicable to communications which are privileged. So it is generally held that if the communication is a privileged one, made in good faith, without malice, under probable cause to believe it to be true, and without negligence, the falsity of the communication does not destroy the privilege." 53 C.J.S. Libel and Slander § 99, p. 156. To the same effect, see Kleinschmidt v. Johnson, Mo., 183 S.W.2d 82, 86[9], and 53 C.J.S. Libel and Slander § 89, p. 143. There is no evidence that the defendants knowingly or in bad faith included any false statements in the communication in question.

Furthermore, there is no substantial evidence that the defendants issued the statement for the purpose of defeating the plaintiff in a union election. The plaintiff testified that he decided to run for the office of general chairman after the meeting of the Executive Committee held on October 26–28, 1960. There was no activity on his part that would charge the defendants with any

knowledge of his candidacy until "somewhere around February 11" when the plaintiff called on the defendant Johnson and told him he was going to run for general chairman. Mr. Johnson testified he told the plaintiff that he might not "be around" because charges were being filed. At that time the initial draft of the charges dated January 28, 1961, had been signed. All of the evidence tended to show that facts which constituted the substantial basis of the charges had been discovered and the plaintiff had been confronted with them before he decided to run for the office of chairman. This is established by plaintiff's own evidence.

The plaintiff further contends that the communication was published excessively and beyond the limits of the privilege. There is no direct evidence that the defendants caused the statement of charges to be communicated to anyone not authorized by the constitution to receive it. Nor are the circumstances such that it can reasonably be inferred that the defendants were responsible for posting a copy of the charges on the bulletin board in the railroad yards at Houston, Texas, or for the presence of the copy observed in a railroad office in Little Rock. On the other hand, the exhibition of the charges by the plaintiff to members of his local lodge and others is a more reasonable explanation of the knowledge of the charges which the plaintiff asserts his neighbors and fellow workers had.

 The defendants offered to prove that the plaintiff, tried before a Trial Committee, was found guilty and was ordered suspended which punishment or discipline was later changed by a convention of the organization to a reprimand. The offer was refused and the defendants contend on this appeal that the evidence should have been admitted, but we do not reach the question for decision. There is no dispute, however, that the charges against the plaintiff were processed as provided by the constitution and bylaws. In the very nature of this procedure which was binding on the plaintiff, it is inconceivable that the charges would not receive publicity beyond the persons to whom the defendants were obligated to furnish copies of the charges. The defendants would not be liable, however, for any republication or dissemination of the communication by the plaintiff, or which resulted from the independent or unauthorized acts of others into whose hands the statement came in processing the charges in the manner contemplated by the constitution and bylaws of the Brotherhood. 53 C.J.S. Libel and Slander § 85, p. 137.

 A presumption generally exists that acts have been performed in good faith and rightfully as opposed to any presumption of misconduct or illegality. State ex rel. Kugler v. Tillatson, Mo., 312 S.W.2d 753, 757[7]. A finding of excessive publication cannot be based on speculation or surmise. The burden of proving actionable publication was on the plaintiff. We conclude that there was no substantial evidence that the defendants published the communication in violation of their privilege.

 If the doctrine of qualified privilege is to have meaning and effectiveness, it must be interpreted to give protection from civil liability where warranted by the occasion to which the privilege attaches. On the whole record we conclude that a qualified or conditional privilege was applicable to the occasion in question and that there was no substantial evidence of any abuse or violation of the privilege by the defendants.

In support of his contentions on these issues, the plaintiff has cited § 559.430, RSMo 1959, V.A.M.S., and several Missouri decisions, some of which we have referred to in the course of the opinion. We have examined all authorities cited and others but find nothing to justify a conclusion contrary to that which we have reached. For the reasons assigned, the trial court erred in refusing to direct a verdict in favor of all defendants who have appealed. In view of the conclusion reached,

it is unnecessary to consider other allegations of error presented.

Accordingly the judgment is reversed as to all defendants.

All of the Judges concur.